NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-749

ADOPTION OF GENEVA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother of Geneva appeals from a decree issued by a judge of the Juvenile Court terminating her parental rights, dispensing with her consent to adoption, approving Geneva's adoption plan, and declining to order posttermination or postadoption visitation.[2] The mother contends that the judge failed to make independent findings of fact, and impermissibly adopted the findings and conclusions of law proposed by the

---

[1] A pseudonym.

[2] The judge also terminated the parental rights of Geneva's father. He is not a party to this appeal.

Geneva argues for affirmance of the decree. She contends that there was overwhelming evidence that her mother is unfit to parent her and that termination of the mother's parental rights is in her best interest. She notes that this case has "dragged on for seven years," which has caused her "mental and physical anguish," and that she is entitled to the stability that adoption by her preadoptive family will bring her.

Department of Children and Families (department).  She further argues that some of those facts are clearly erroneous, and that the judge failed to adequately consider her progress in achieving sobriety and her participation in mental health treatment in determining that termination of her parental rights was in Geneva's best interest.

We conclude that although the preferred practice is for the judge to write an independent set of findings of fact, in this case the findings are amply supported by the evidence and none of them are erroneous.  We further conclude that the decision to terminate the mother's parental rights was based on clear and convincing evidence, which established that she had a long history of neglecting Geneva and that she suffered from untreated mental illness and alcohol abuse.  Despite the mother's progress in addressing these issues prior to trial, the judge did not abuse his discretion in determining that she was not currently fit to assume parental responsibilities, that her unfitness would likely continue indefinitely into the future, and termination was in Geneva's best interests.  Accordingly, we affirm.

Background.  In a previous care and protection proceeding, the mother entered into a written stipulation, which was approved by the judge, granting permanent custody of Geneva to the department.  Thereafter, following a trial on the

2

department's petition to terminate parental rights, at which the mother, one of Geneva's preadoptive foster parents, a department social worker, a forensic trauma evaluator, and a third-party, visitation supervisor testified, the judge concluded that the mother was currently unfit to assume parental responsibility for Geneva and that it served Geneva's best interests to terminate the mother's parental rights. We summarize the relevant facts found by the judge as follows, all of which find support in the record.

The mother struggled for years with substance misuse prior to Geneva's birth. She began drinking at the age of fifteen and later used cocaine and marijuana.[3] Geneva was born on May 14, 2015. Within two weeks of her birth, on May 28, 2015, the department received a report pursuant to G. L. c. 119, § 51A (51A report), alleging the mother's neglect of Geneva.[4] Specifically, the report, which was later supported, included allegations that Geneva was severely sunburned and there was a lack of attachment between the mother and Geneva. When Geneva was three months old, in August 2015, she qualified for early

---

[3] The mother's struggle with addiction contributed to her losing custody of her older son, who tested positive for cocaine at birth. The mother's parental rights to that son were terminated in 2010, and he has since been adopted.

[4] The 51A reports "set the stage" only. Adoption of Chad, 94 Mass. App. Ct. 828, 830 (2019), quoting Custody of Michel, 28 Mass. App. Ct. 260, 267 (1990).

intervention services due to developmental deficits but did not receive the services to which she was entitled because the mother did not follow through with enrollment. Although the mother initially agreed to work with a parent partner in November 2015, the mother did not sign the necessary releases and ultimately refused the service altogether.

Meanwhile, the mother's living situation was precarious. Upon Geneva's birth, the two lived together at a residential shelter. However, by December 2015, they were placed in an emergency assistance motel due to the mother's "inappropriate [conduct] with shelter residents and staff, refus[al] to engage with people of color and refus[al] to engage with shelter support staff and referred services." During the mother's time at the motel, staff shared concerns regarding her failure to follow through with daycare programs, lack of engagement with mental health and substance abuse treatment, and insufficient interactions with Geneva. In addition, on one occasion, staff reported that Geneva was left to sleep on a changing table. On another occasion, the police responded to a report that the mother was pushing Geneva's baby carriage, shaking it, and screaming at Geneva while walking in the rain. Both the mother and Geneva were soaked and subsequently transported to the hospital for an evaluation. One month after this incident, a department social worker conducted a home visit at the shelter

4

motel and observed the mother to have a "flat affect," a lack of interaction and affection with Geneva, and noted that Geneva was not verbal.

In July 2016, the mother and Geneva moved in with the mother's former foster family. The family subsequently shared concerns regarding the mother's presentation, alcohol use, and ability to provide sufficient care for Geneva. In April of 2017, the department received two 51A reports alleging neglect as the mother was observed by police to be "incoherent, under the influence, and suffering from mental health issues."

The department assumed emergency custody of Geneva after receiving an additional 51A report filed on June 14, 2017, which was later supported, alleging that the mother was abusing alcohol while caring for Geneva, as evidenced by her slurring her words, acting incoherently, and sleeping all day while Geneva was in her care. At the time, Geneva was twenty-five months old and "was found to be developmentally delayed with a sad and flat affect and to be non-verbal." Geneva had three short-term foster placements until she was placed in her current preadoptive home on July 5, 2017.

After the department obtained custody of Geneva, the mother was offered services and action plans were created. The action plans, which were modified over time, required the mother to, among other things, abstain from alcohol, complete a

5

neuropsychological evaluation, attend parenting group classes, maintain stable housing, and engage in vocational training.  The mother made efforts toward completing several of these tasks, and she complied with a portion of the tasks assigned to her.  However, contrary to her claim, she did not maintain sobriety and she was not able to achieve improvement in her parenting skills and judgment.[5]

Additionally, and notably, the mother failed to engage appropriately with Geneva during visits.  The social workers who were present during visits at various locations observed that Geneva had very limited interactions with the mother, did not answer her questions, and would move herself to be physically distant from the mother.  It appeared that Geneva did not enjoy the visits and that they caused her anxiety.  The judge found, "Geneva who otherwise is amiable and chatty with her foster parents, social workers and others does not talk about her mother almost at all except to express displeasure to have to attend visits."

---

[5] As the judge found, the department offered several parenting services to the mother, including three parent partners and two in-home therapy teams.  Many of these services ended because of the mother's lack of engagement with the service provider and lack of increase in the mother's parenting skills and judgment.  The judge further found that "Mother has not accepted treatment programs in full and chose the pieces she felt served her needs."

Based on the mother's interactions with Geneva during visits and her failure to engage in ongoing mental health and therapeutic services, the department changed the goal for Geneva to adoption in March 2018. Four months later, on July 19, 2018, the mother gave birth to her third child (son), who has been removed from the mother's custody three times due to concerns of neglect and the mother's consumption of alcohol.[6] The department arranged for visits between the mother, Geneva and the new baby, but the visits were not successful. The mother could not supervise both children and Geneva increasingly became disengaged.

At the time of trial in November 2022, Geneva was seven years old. The judge found that Geneva wanted to be adopted by her preadoptive family and had expressed frustration over the fact that her adoption has not been finalized. The judge also found that Geneva had developed a strong and healthy attachment with her preadoptive parents and would be negatively affected if

---

[6] In July 2019, the son was removed from the mother's custody after a 51A report alleged that she was under the influence while caring for him, and she had admitted to police that she had consumed at least ten beers and two wine coolers. The son was removed from the mother's care again after she failed a breathalyzer test, a condition for custody, in April 2020. He was removed a third time after the mother tested positive for alcohol on March 19, 2021, a day after she entered into the written stipulation finding the mother unfit and giving the department permanent custody of Geneva.

she were to be removed from their care. Geneva was engaged in numerous extracurricular activities and the preadoptive family was providing a "healthy, safe, and stimulating upbringing for [Geneva]." With regard to the mother's ability to parent Geneva currently or in the future, the judge noted that the mother failed to acknowledge and address her "long history of drug overdoses, alcohol arrests, alcohol hospitalizations, physically violent encounters with others,[7] psychiatric hospitalizations, and mental health encounters." Thus, despite some progress in achieving sobriety and participating in mental health treatment, the judge concluded that termination of the mother's parental rights was in Geneva's best interests.

Discussion. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilian, 91 Mass. App. Ct. 727, 729 (2017), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011). "When reviewing a decision to terminate parental rights, we must determine whether the trial judge abused his discretion or committed a clear error

---

[7] In 2018, the mother reported an extensive history of domestic violence in two prior relationships. She had reconstructive surgery to her face due to being assaulted by abusive partners and may have suffered a traumatic brain injury.

8

of law." Adoption of Elena, 446 Mass. 24, 30 (2006). "When making this determination, subsidiary findings of fact must be supported by a preponderance of the evidence, with the ultimate determination of unfitness based upon clear and convincing evidence." Adoption of Rhona, 63 Mass. App. Ct. 117, 124 (2005).

1. Findings of fact. The mother asserts that the judge erred by largely adopting the department's proposed findings of fact. While it is true that many of the judge's findings closely track those proposed by the department, and therefore are "subjected to stricter scrutiny by an appellate court[,]" (citation omitted), Adoption of Hank, 52 Mass. App. Ct. 689, 693 (2001), the findings "are not to be rejected out-of-hand, and they will stand if supported by evidence." Care & Protection of Olga, 57 Mass. App. Ct. 821, 823-824 (2003), quoting First Pa. Mtge. Trust v. Dorchester Sav. Bank, 395 Mass. 614, 622 n.12 (1985). Although we emphasize that the preferred practice is for the judge to issue independent findings,[8] we may not reject findings -- even those "lifted wholesale" from one party's

_____

[8] Our cases have consistently held that "[p]roceedings aimed at dispensing with parental consent to adoption involve high stakes and deeply important personal rights. It is critical, therefore, that the judge's decision reflects careful factual inspection [of the evidence] and specific and detailed findings by the judge" (quotation and citations omitted). Care & Protection of Olga, 57 Mass. App. Ct. at 823.

proposal -- if they are supported by the evidence.  Care &
Protection of Olga, supra.  See Adoption of Hank, supra (where
"a judge has adopted a party's proposed findings verbatim[,] we
continue to review those findings under the clearly erroneous
standard").  Here, the judge explicitly acknowledged that he
relied on the department's submission and further stated that he
had conducted an independent review of the evidence.[9]  The
judge's findings, including those adopted from the department's
submission, are sufficiently supported by the evidence in the
record,[10] and, more importantly, support the judge's ultimate
conclusion that the mother is currently unfit, her unfitness is
likely to continue into the indefinite future, and that
terminating her parental rights is in Geneva's best interests.

_____

[9] The judge wrote that "[a]ny adoption of proposed findings
in whole or part was done to conserve resources as the proposed
findings reflected the facts as I find upon independent
consideration."

[10] We note that a number of the judge's findings are taken
from a summary contained in the forensic trauma evaluation
prepared by Christina Chludzinski, who was qualified at trial as
an expert in child forensic evaluations.  In fact, the
department's proposed findings incorporate many portions of this
summary verbatim.  The report itself was introduced as a joint
exhibit at trial with no limitations.  Chludzinski also
testified that she conducted a "thorough review" of all relevant
records in conducting her evaluation.  As such, it was
reasonable for the judge to rely on this report in making his
findings.

10

The mother also argues that certain findings of fact -- one concerning positive tests for alcohol, and the other concerning the psychological harm to Geneva should she be removed from her preadoptive home -- are clearly erroneous. "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Custody of Eleanor, 414 Mass. 795, 799 (1993). We discern no merit to either challenge.

First, with respect to the alcohol tests, the mother argues that finding number thirty-four, which states that she tested positive for alcohol "several times," is both misleading and clearly erroneous because she was tested approximately 2,496 times and of those tests only three were positive.[11] This claim does not require extensive discussion because even if we were to accept the mother's assertion that the finding is misleading, there was substantial evidence of the mother's misuse of alcohol and the extent to which it impacted her ability to parent Geneva

---

[11] The judge found that "Mother's positive[] [breath test results] were often near court dates and times of other stress. She denies alcohol relapse during these periods. The Court did not credit her testimony on this point."

11

apart from what the mother perceives to be positive evidence of her sobriety.

Next, the mother challenges the judge's finding that Geneva would suffer psychological harm should she be removed from her preadoptive family (finding number sixty-one). However, the judge was entitled to credit the expert testimony of the forensic trauma evaluator, who concluded that Geneva would like to be adopted and would likely be psychologically harmed if she were separated from her foster family. See Custody of Eleanor, 414 Mass. at 799 ("the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference").

Finally, as to the mother's claim that the judge erred by failing to consider how potential harm to Geneva could be alleviated should she be removed from her preadoptive home, any such failure (and we discern none) would have no bearing on the ultimate issue. In other words, because the evidence fully supported the department's plan for Geneva to be adopted by her preadoptive family, it was not necessary to address the issue of how best to accomplish her removal. See Care & Protection of Olga, 57 Mass. App. Ct. at 824-825.

2. Unfitness determination. The mother contends that even if the judge's findings of fact are not clearly erroneous, the judge abused his discretion in terminating her parental rights

12

because the facts as found were not sufficient to support a determination of unfitness by clear and convincing evidence. We acknowledge, as the mother asserts, that the department has the burden of proof; however, we are not persuaded that the judge committed an error of law or abused his discretion. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 615-616 (2021) ("[w]here there is clear and convincing evidence that the parent is unfit and likely to remain so, we give substantial deference to the trial judge's decision regarding the child's best interests and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion" [quotation and citation omitted]). Here, the judge's determinations as to the mother's present and future unfitness are supported by sufficient evidence to meet the requisite standard and the subsidiary findings regarding the mother's substance use, unaddressed mental health issues, history of child neglect, lack of parenting skills, failure to improve those skills through services, and refusal to cooperate with the department.

Furthermore, contrary to the mother's assertion, the judge properly considered all the evidence in determining that the mother was not likely to meet Geneva's needs in the future. He did not rely exclusively on "past history of alcohol and substance use" in his determination of unfitness. Instead, the

judge found that despite evidence of the mother's sobriety at the time of trial, the mother had not made any "real progress in recovery from her addiction/substance abuse problems which have already le[]d to three children's removal and the adoption of the oldest child."  In sum, the judge acted within his discretion when he considered the mother's decades-long pattern of substance abuse and declined to credit her testimony regarding sobriety.  See Custody of Eleanor, 414 Mass. at 799-800; Adoption of Yvonne, 99 Mass. App. Ct. 574, 581 (2021).

The mother also challenges the judge's conclusion that her struggles with mental health warranted a finding of unfitness. A "[m]ental [health] disorder is relevant only to the extent that it affects the parent['s] capacity to assume parental responsibility, and ability to deal with a child's special needs."  Adoption of Frederick, 405 Mass. 1, 9 (1989).  Here, the record contains evidence of a nexus between the mother's unaddressed mental health issues and her ability to parent. While there is evidence of the mother's eventual engagement in mental health treatment, the judge was entitled to "rely upon past patterns of parental neglect or misconduct in determining current or future fitness."  Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018).

Lastly, the mother argues that the judge failed to consider several facts in her favor.  While the record contains some

14

evidence of the mother's appropriate behavior during visits and her completion of certain action plan tasks, a host of other factors supported the determination of unfitness.  We note that the mother does not challenge the judge's findings concerning her lack of engagement in services apart from stating that "[h]er resistance to [the department] was a typical response for [department] clients."  Nor does she contest the instances where she neglected her children.  Our review leads us to conclude that the mother's arguments "amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses."  Adoption of Don, 435 Mass. 158, 166 (2001).

Decree affirmed.

By the Court (Rubin, Hand &
  Smyth, JJ.[12]),

Clerk

Entered:  May 21, 2025.

---

[12] The panelists are listed in order of seniority.